Ms. Brown? I'm sorry, Ms. Brown, we're having a hard time hearing you. Is there any way to increase your volume? It appears not. Can you call in on the number and use the telephone for your audio? Much better. Is that better for you, Judge Shepard, for the panel? I think it's going to be an acceptable volume for me. Judge Strauss and Judge Kobus, can you hear? Yeah, I can. Okay. Thank you. All right, Ms. Brown. Good morning and you may proceed. Thank you, Your Honor. My name is Katherine Brown and I represent the appellee, Scott Smith. The primary issue on appeal is whether the district court used the appropriate standard to determine whether Golden China needs to make additional changes to the premises in order to come into compliance with the ADA. Specifically, whether, as Smith asserts, the maximum extent feasible standard for alterations applies or whether the readily achievable standards applied by the district court is appropriate. 42 U.S.C. 12183 indicates that discrimination for purposes of 12182A includes failure to make alterations to the maximum extent feasible. In an attempt to get around the requirements of 42 U.S.C. 12183, the district court relied upon the safe harbor provision of 28 CFR 36304D to Romanet 2B. However, in citing the regulation, the district court ignored the last sentence of the regulation, which states that non-complying altered elements may also be subject to the requirements of 36406A5. 36406A5 in turn states that altered facilities or elements covered by 36402 that were altered before March 15, 2012 and do not comply with the 1991 standard shall, on or after March 15, 2012, be made accessible in accordance with the 2010 standard. Further, the 2010 standards define accessible as a site, building, facility, or portion thereof that complies with this part. So in this instance, the alteration that was found, the repaving that was found to be an alteration by the district court clearly falls under 36402, which talks about a change to a public accommodation that affects or could affect the usability of the building or facility or any part thereof. That occurred in 2001 or 2002. It's undisputed by the expert put forth by the defendant that that alteration was not done in compliance with the 1991 standard. Because it wasn't done in compliance with the 1991 standards, under 36406A52, since it's after March 15, 2012, to be compliant now and to not be discriminating against a person with a disability, the ramp and parking needs to be brought up to the 2010 standard. Council, I want to ask you about the provision you talk about. It uses the word may also be subject to the requirements of 36406. What do you think the words may also be subject to means? I think that means that it must follow under the requirements as laid out in 36605, which is that it was altered, and it's covered by 36402, and it was constructed or altered before March 15, 2012, and it does not comply with 1991. What I'm getting at is I wonder whether the answer is actually because may also be subject means in addition to or something similar. I wonder if the answer is actually that readily achievable and to the maximum extent feasible describe different things. Why isn't that the case so that both of them are operable? Well, they definitely do mean different things. They are different standards, but the maximum extent feasible is the higher standard, and if it applies, inherently, since it's the higher standard, it's the one that would have to be met in order to not be discriminating against a person with a disability. I might differ with you. Oh, go ahead. I didn't mean to interrupt you. So if you were to say if somebody makes a change, the alteration after the safe harbor says that existing, it's just talking about existing facilities, if you alter or newly construct them after March 15, then it has to comply with the 2010 standard, whereas under 36406A5, it's saying if you didn't fix your alteration before March 15, 2012, so that you could have done either standard, but then you are stuck with the 2010 standard. They both sync up in that way. Before March 15th of 2012, you could be, if you are, the safe harbor is, if you are compliant with the 1991 standard, you don't have to change it to be in compliance with the 2010 standard. Let me ask you this. You use the word inherently, and I'm not sure the word inherently actually works here, and here's why. Because readily achievable focuses on the ability of the person or business making the change, their ability to pay. If you look at all the factors that fall under that, it's about does the business have the ability to pay, what's their financial situation, how much would it cost, et cetera. And to the maximum extent feasible focuses entirely on the physical ability to make that change. Can it actually be done? Is it feasible to make that happen? So I wonder if the real answer, using also subject to, is that you need to make the changes that are readily achievable to the maximum extent feasible. In other words, that the two standards go hand in hand, using the may also be subject to language. Well, I would disagree because the readily achievable falls under one section of the code, 42 U.S.C. 12182. That's one requirement under the plain language of the law. I'm not talking about the regulations that implement it, but the actual law. And 12183, the plain language of that indicates that if you've made an alteration, then it has to be done to the maximum extent feasible. So although the state harbor is allowing you to essentially make a choice between 1991 or 2010 standards and which one applies, the fact that they're putting in 36406A5 is saying if you made an alteration in the past, the 406 is also updated at the same time to indicate that if you had an uncomplying alteration, it must be made accessible in accordance with the 2010 standards in this instance because it's well past March 15th of 2012. So my last question is, so you agree with the district court that these two standards are incompatible. You would just come out the other way. You would say to the maximum extent feasible is the governing standard, not the reasonably achievable standard. Is that a fair characterization? Yes, because that's what the statute says. So the plain language of the statute. And these are just the regulations that are implementing it. And the point is, the point of having the change between the 91 and 2010 standards is that so that people that were compliant with the 1991 standards aren't penalized and required to make changes to come into compliance with the 2010 standards in the case that they are stricter, which is true in certain, at certain times. So, if you get your job the first time, you don't have to re-fix it for this new standard. Ms. Brown, two questions. The first is just for clarification. Is Mr. Smith, the appellate here, the same appellate as in the Bradley Pizza case? Yes, Your Honor. Okay, and that leads me to the second question. And that is, I'm wondering whether the appellant here has standing. Because the impression one could draw from the record here is that Mr. Smith did not go to this establishment for the purpose of patronizing the establishment and really had no intent in ever returning. And it's kind of, you know, the idea of just roaming around, dropping in on various establishments to see if there's a colorable statutory violation here, irrespective of whether there was any real intent to patronize the establishment or to ever return. And as I recall here, Mr. Smith, this is 50 miles away from his home. And one thing that stuck out to me is his testimony that he doesn't even like Chinese food. So, what about the standing issue? Well, the district court found that they were standing based on his assertion that he intended to return. And for summary judgment to be entered, there might be an issue of fact at best. But for the purposes of summary judgment, the district court found that there was standing based on his assertion. Red Wing, where the Golden China is located, is along his path from where he lives to where his parents live. So he drives through there on a regular basis if he was to want. And he meets up with his family in that area again on a regular basis. They go to the casino nearby as a family, well, before COVID, once or twice a year. And they tend to go somewhere to eat in Red Wing. So his position is that he should be able to go eat. It's not necessarily in the record, but he's an incredibly picky eater. So most restaurants don't have things that he likes. He goes there and eats the minimum, whatever he can find. And if there are no other questions right now, I'll reserve the rest of the time. All right. Thank you, Ms. Brown. Mr. Linderuth. Good morning, Your Honor. Make your seat. Thank you, Your Honor. Brian Linderuth of Baston Flanagan, appearing on behalf of Appellees. There seems to be some confusion, Your Honors, in the safe harbor that Judge Thunheim replied. Ms. Brown represented that that safe harbor was found in section 36.304, subpart D to Roman at 2B. That's not the case. As reflected in page 42 of the addendum, Judge Thunheim relied on section 36.304B3. Judge Strauss, you focused on the language of the provision that Ms. Brown cited, the language specifically that may also be subject to. And you asked what was the correct interpretation of that. Ms. Brown answered that it must be subject to alterations. That is incorrect. I see that as directional, that the alteration requirements may apply. But you must first get over the threshold of whether the alteration is readily achievable. The core issue before this court is whether a prior resurfacing project, nearly 20 years in the past, now required Golden China to spend an unlimited amount of money to undergo extensive repairs to its parking facility, including its existing accessible parking space, access aisle, and ramp. Counsel, Judge Kobus here. I'd like to go back to one of Judge Strauss's questions to your colleague. Do you see a conflict between 402 and 304, or do you read those as compatible? I do. I see that that is something that Judge Thunheim clearly wrestled with in his opinion. Ultimately, his classification of the resurfacing work as an alteration appears to be dicta, and he concedes that it's not relevant to whether or not that safe harbor applies. The conflict really lies or is created by the sweeping broad definition of alteration in the alteration section of the provision, which folds in any modification that impacts or could impact the usability of the facility. Arguably, that encompasses any modification a business would make, good faith reliance of the safe harbor provision that Judge Thunheim's decision is based. This safe harbor provision was designed for the purpose of incentivizing businesses to enhance the usability of their existing facilities, where strict compliance with the requirements for new construction and alteration was not readily achievable, which readily achievable means easily accomplishable and can be carried out without much difficulty or expense. Counsel, can I ask you, I'm going to follow up by asking about D3, and in particular 36304D3, and in particular one as well. So one read in conjunction with three, it says, except as provided in paragraph D3, measures taken to comply with the removal requirements shall also comply with the alteration requirements. That's essentially what it says. So if we are, in fact, in D3, then I wonder whether we're in the safe harbor, because that except as means presumably that we're not in the safe harbor anymore. What's the significance of that? So if I'm understanding your question correctly, Judge Strauss, I may not be. That safe harbor really carved out and excludes any repairs undertaken as part of the safe harbor from being classified as an alteration. Well, what it says, I think D3, what it says is if you make a partial modification, in other words, you have two steep of a slope, but you kind of do a good job, but you don't do a perfect job in complying with the regulations, I read D1 as saying that's not good enough, that doesn't put you in the safe harbor, because you still have to comply with 402 through 404, 402 through 406. Am I wrong about that? I would assert respectfully, Your Honor, that you are incorrect. That interpretation would render D3 meaningless. It would, or about that, I can't foresee any, for that safe harbor to have any effect at all. It has to not require the alterations requirements. Yeah, I apologize for. No, I'm not sure you're right. I'm not sure you're right necessarily that it renders it meaningless. But let me follow up with this, which is except as provided in paragraph D3 of this section. That's in D1. What does that mean? I'm going to go back to the sort of basics. What does that mean? To me, that means that you focus on D3. If D3 applies, you don't have to comply with alteration requirements in D1. So D3 is the exception to D1. So it's not, it doesn't say notwithstanding D3, you still have to do the alteration requirements. It says, unless the exception in D3 is triggered, you have to undertake the alteration requirements. I think the way that you were thinking about it, at least in your question to Ms. Brown, is correct. That a business, that the readily achievable standard does apply as part of the alteration. It makes no sense that a business that undeniably has insufficient financial assets should have to undergo repairs that would require it to go out of business. The record provides that in the three years prior to the initiation of this lawsuit, Golden China operated at a net loss.  Golden China is a small family-owned restaurant, and its two employees work more than nine hours a day, six days a week, and earn at or near poverty-level wages. At the summary judgment stage, Scott Smith was required to have a plan to address alterations he demands, the cost of those alterations, as well as how those alterations would impact the finances and operation of Golden China. He failed to meet that burden. The extensive $29,000 to $39,000 required to modify Golden China's parking lot are not. Scott Smith only has bald assertions that the measures are readily achievable because he speculates that Golden China could qualify for a mortgage or that tax credits and deductions could help defray the costs. The argument regarding tax credits and deductions was the same argument raised in the Disability Support Alliance v. Hartwood Enterprise case heard by this circuit, which that court rejected. As for the mortgage speculation, even if Golden China were able to qualify for a mortgage, Golden China testified that it would not be able to afford the mortgage loan payments. There is nothing in the record to support the contention that Golden China could afford these costs, and the rule that Mr. Smith is advocating would disincentivize other businesses from taking any measures to improve the usability of their facilities. If they could not afford the exacting requirements set forth for alterations and new constructions, make no mistake, Your Honors, that the rule Mr. Smith is advocating would amount in less access, not more. Counsel, I want to ask you about my standing question. I think the district court made a call on the standing question, but does that does that end the issue? Can we go into that issue, Suspante? Your Honor, I believe you can. Under Federal Rules Civil Procedure 12H3, subject matter jurisdiction is never waived. If a court determines that it lacks standing, the action must be dismissed, and the district court could not appropriately have arrived on its decision on the merits. As Ms. Brown noted, that Judge Thunheim credited the testimony to Mr. Smith at summary judgment on the standing issue. Golden China argued in the district court that Mr. Smith lacks standing for some of the reasons you cited, his lack of an area 50 miles from his residence, the fact that he doesn't like Chinese food, and the fact that despite the information stated in his declaration, the only time he has gone back to the businesses he sued was to see if there's any other violations. Well, you know, maybe you can help me here and correct me if I'm incorrect, but have you read the Bradley Pizza case? I have, Your Honor. I was... Didn't that, the visit that led to this lawsuit, the visit to Golden China, didn't that visit occur on the same day as the visit to the Bradley Pizza restaurant that's described in that case? You're exactly correct, Your Honor. And then secondly, didn't... I haven't gone back in the record of the Bradley Pizza case, but I'm looking at our court's per curiam opinion, which recounts that... And that he had no specific plans to visit Red Wing in the foreseeable future. That's precisely correct, Your Honor. So what do we do with that? We have a case handed down by a panel of our court that kind of refers to this same appellate and his state of mind or his testimony that seems to be a little bit contrary to what the record in this case shows. What do we do? If the court determines that the district court lacked standing, it should still affirm the dismissal of this case, reversing only to modify that it be without prejudice. The record in this case and the Bradley case is substantially similar. Mr. Smith testified for three cases, all in the same deposition. That was for the Bradley Pizza case, this case, and a separate case in Beer Stew, which was also dismissed by the Honorable Judge Schultz for lack of standing. Let me ask you this. I want to follow up on the standing issue, which is, and this gets a little bit to Judge Shepard's question, is the testimony and the evidence here is a little different than in the Bradley's Pizza case. And here, as I recall, and you can correct me if I'm wrong, he made the argument that it would not have been safe to go up the ramp of this particular restaurant. And we said, I actually authored an opinion. I remember which one it was, the Hillshine case at Holiday Station Stores, where we said if there's an assertion that it's unsafe to go up the ramp or it's unsafe because you could get hurt, that that's probably enough for standing. You don't actually have to get hurt in order to have standing to challenge an ADA violation. Does that make this case different? I understand it's a little unfair if a student argues standing. A little different for Bradley's Pizza? Yeah. So, Hillshine opinion, Your Honor, if I'm correcting, if I'm remembering it correctly, that not only do they need to observe the violation, they have to connect to their decision to leave. Because injunction, injunctive relief is the only relief available under the ADA, an individual must also show an intent to return. And the Supreme Court's holding in Lujan Defenders of Wildlife stands for the proposition that someday vague general intentions to return are insufficient. And that is what the Bradley Pizza case found. It looked at the testimony and found that Mr. Smith lacks sufficient intentions to return to the facility. And therefore, the court didn't have standing to issue an injunction. Unless Your Honors have any further... So what do we, two district judges looked at the same testimony and interpreted it differently? What happened? Judge Tostred, as reflected as his opinion in the Bradley Pizza case, really went out of his way and reviewed the entire deposition transcript. For his part, Judge Thunheim, in considering the evidentiary burden and the standards of summary judgment, generally credited the testimony to Scott Smith in this case. I agree with what the court appears to be representing, that it does appear to be in conflict. And if Judge Thunheim lacks standing, the dismissal of this case was still appropriate, but arguably on different grounds. Thank you, Your Honors. Thank you. All right, Ms. Rudolph, how much time does Ms. Brown have remaining? Approximately four minutes. I believe I have three and a half minutes, approximately. All right. You may proceed. Here's my question as we get started. We have the same testimony, the same deposition in Bradley Pizza as we do in the case now before the court. And we have an opinion of a panel of the court that describes the testimony and makes a legal—an application of law with respect to that testimony. Why are we not bound? If it's the same testimony, the same appellate expressing the same intent or lack of intent to ever return identical testimony, and we have a panel opinion, why are we not bound by that? Won't it be a little somewhat peculiar to have a different result based on the same testimony? Well, first, it's an unpublished decision. It's per curiam, so it's not binding precedent. But fundamentally, when it comes to—and if we were to make—if the court was to make it a binding precedent, there would be a conflict between other circuits regarding what is necessary for standing, specifically regarding whether the location needs to be open, and you intend to actually visit the location to patronize it. And this is problematic because other districts have found tester standing to be an appropriate standing. You go there, you see that there's a barrier, and you decide to bring—you bring suit, and your intent is to go back at a minimum to see if you can now enter and if they come into compliance. In this case, when we talk about the amorphous intent to return, this is problematic, particularly in this case, because from just a common-sense standpoint, why would anybody make a concrete plan on a specific day to go back to a place they cannot get into, where they're terrified—that was the word that Scott Smith said—of the ramp? Because of those barriers, he—no person would want to go back somewhere where they cannot get in and where they're scared to even attempt it. Now, what he said he wants to do is return once it's compliant, but it's not compliant yet. They have made no changes to that ramp, so it doesn't make sense for him to say, I'm going to go back on May 30th, for example, because he still couldn't get in because the changes haven't been made. How does this case interact with the Hillshine case? I think you represented Mr. Hillshine, if I recall correctly. How does that interact? And I forget which one dealt with it, but one of them dealt with a trash can issue, I think. Yeah, so—sorry, there's multiple holiday cases, so if I have the wrong one, but there's a few where it didn't make sense or he could not try to go in, whether it was because there was a trash can at the top of the ramp where he, from the bottom, didn't believe he could navigate it properly, or there's another one where somebody, there was no, the ramp didn't have marked off stripes at the bottom of it, and somebody was parked there because it wasn't marked off, so he literally could not get to the ramp. And those types of things, just because he was unable to go inside doesn't mean that he didn't have standing. There's a reason he wasn't able to go inside, and that's because of the barriers that were present. The same thing applies here, and applied in Bradley Pizza, at least at the time that he originally visited. There were various presents that made it impossible for him to go inside. He's terrified of that ramp. Or in the case of the holidays, he is unable to navigate the curb ramp, either depending on the one, because it's blocked and he couldn't get past the car that was there, or because there's a garbage can at the top that makes it impossible for him to maneuver properly to get to the door. And just to make somebody attempt something where, in this case, where Mr. Smith is afraid that he would fall over if he was going to attempt it, as if his chair was going to fall over, or they wasn't going to make it up it, it really turns things on its head and makes it so almost nobody would have standing. Because it's just too much to ask that somebody put themselves in harm's way in order to have standing. Can I ask one additional question? Yep. Yes, proceed. Maybe you don't have to say a specific date, but should you have to be able to say, or should the plaintiff have to say, if it is fixed, if this defect under the ADA is fixed, I will go to this restaurant again, or I will show up at this restaurant. Maybe that's the intent to go in the future. And do we have that here? Yes. That has been asserted by Mr. Smith, both in his complaint and in his testimony, that when it is successful, he will return. But it is very hard to have a date for that, because he does not know when it's going to be fixed. And as Mr. Linerous pointed out, he has gone back to see if it was fixed. He's actually been back to check to see if it's been fixed, which, although obviously that happened after the filing of the complaint and standing is measured from the time of filing, it does evidence his intent to make sure, to check up on the locations to see if they've made changes and if he can now access them. So Council, didn't Mr. Smith testify that he had no specific plans to visit not just the restaurant, but the town? On that, as of the date of his deposition, he didn't have a specific date in mind to go. That doesn't mean that he hadn't been back before that and found out that they still hadn't made changes. And he still didn't have information, either from himself or through myself or opposing counsel, that had made changes. So it would be a waste of time. It would be a waste of his time to make a plan to go back at that point when it's not compliant because he can't get in. He shouldn't have to make. Well, but you're focusing on the restaurant. I'm talking about the town, the community itself. Right. He has no plans on the foreseeable future to visit the community, much less the restaurant. Well, at the time of that, at the time of the testimony that's not in the testimony, but at the time of his testimony, his mother was in the hospital. So he what was his normal back and forth was changed because of things that happened after the filing of the complaint. It doesn't mean that when things when the family problems he was having medical problems were gone, that they wouldn't go back to visiting Red Wing a couple times a year. And there are certain there are certain types of public accommodations where you make you make a specific plan, like a hotel. But there's other places like I have my favorite restaurant in town where I live. I do intend to go back. I go back on a regular basis, but I don't. If you ask me when I plan to go back next, I wouldn't be able to tell you that because it's more of a spur of the moment decision or I want to go out tonight. This is the type of food I'm interested in eating. Similarly, I think we understand. And thank you for your response. Thanks to both counsel for your arguments. The case is submitted and we will render a decision in due course. Thank you very much.  Thank you. You may call her now.